# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| PAIGE BELOATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:22-cv-06037-DGK |
| | ) | |
| LOUIS DEJOY, Postmaster General, | ) | |
| United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED SUGGESTIONS IN SUPPORT

Respectfully submitted,

Teresa Moore
United States Attorney

By      */s/ Elizabeth D. Hatting*
Elizabeth D. Hatting, MO #67337
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3130
Facsimile: (816) 426-3165
Email: elizabeth.hatting@usdoj.gov
ATTORNEY FOR DEFENDANT

1

## Table of Contents

I.      Overview………………………………………………………………………..8

II.     Statement of Undisputed Facts………………………………………………...10

III.    Standard for Summary Judgment…………………………………………….....21

IV.     Beloate Was Not Subjected to Disability Discrimination or Retaliation by USPS……….22

        A.  USPS Provided Accommodations for Beloate's Alleged Disability
            and Did Not Discriminate Against Her (Count I)…………………………………22

                1.  USPS Accommodated for Beloate's Alleged Disability…………………….....24

                    a.  Beloate Failed to Identify any Medical Need to Be Exempted
                        from the Face Shield Requirement but USPS Accommodated
                        Her Nevertheless……………………………………………………25

                    b.  Beloate Failed to Provide Evidence of a Medical Need to
                        Leave Work by 5:30 but USPS Accommodated Her Nevertheless……….32

                2.  Beloate Was Not Subjected to Intentional Discrimination Due
                    to Her PTSD………………………………………………………34

        B.  No Evidence Supports Beloate's Retaliation Claim…………………………39

        C.  Any Claim for Harassment or Hostile Work Environment Would Fail………………40

V.      Conclusion………………………………………………………………42

## Table of Authorities

**Cases**

*Ahmed v. Napolitano*,
     825 F.Supp.2d 112 (D.D.C. 2011)……………………………………………………23

*Alvarez v. Des Moines Bolt Supply, Inc.*,
     626 F.3d 410 (8th Cir. 2010)……………………………………………………..38

*Argenyi v. Creighton Univ.*,
     703 F.3d 441 (8th Cir. 2013)……………………………………………………...23

*AuBuchon v. Geithner*,
     743 F.3d 638 (8th Cir. 2014)……………………………………………………...35

*Ballard v. Rubin*,
     284 F.3d 957 (8th Cir. 2002)……………………………………………………24

*Benson v. Nw. Airlines, Inc.*,
     62 F.3d 1108 (8th Cir. 1995)……………………………………………………24

*Bezzina v. United Airlines, Inc.*,
     2022 WL 878921 (C.D. Cal. Feb. 24, 2022)……………………………………..26

*Bragdon v. Abbott*,
     524 U.S. 624 (1998)……………………………………………………………...26

*Charleston v. McCarthy*,
     926 F.3d 982 (8th Cir. 2018)……………………………………………………35

*Clay v. Credit Bureau Enterprises, Inc.*,
     754 F.3d 535 (8th Cir. 2014)……………………………………………………41

*Duncan v. General Motors Corp.*,
     300 F.3d 928 (8th Cir. 2002)……………………………………………………41

*E.E.O.C. v. Convergys Customer Management Group, Inc.*,

    491 F.3d 790 (8th Cir. 2007)…………………………………………………………...24

*E.E.O.C. v. Prevo's Fam. Mkt., Inc.*,

    135 F.3d 1089 (6th Cir. 1998)…………………………………………………………27

*Evans v. Cooperative Response Center, Inc.*,

    996 F.3d 539 (8th Cir. 2021)…………………………………………………………..31

*Fenney v. Dakota, Minn. & E. R.R. Co.*,

    327 F.3d 707 (8th Cir. 2003)……………………………………………………23, 24

*Haas v. Kelly Servs., Inc.*,

    409 F.3d 1030 (8th Cir. 2005)…………………………………………………………39

*Harris v. Home Sav. Ass'n*,

    730 F. Supp. 298 (W.D. Mo. 1989)……………………………………………………41

*Heisler v. Nationwide Mut. Ins. Co.*,

    931 F.3d 786 (8th Cir. 2019)…………………………………………………………..34

*Henson v. Union Pacific Railroad Co.*,

    3 F.4th 1075 (8th Cir. 2021)…………………………………………………………...37

*Hoard v. Burns Bros., Inc.*,

    14 F.3d 835 (8th Cir. 1998)……………………………………………………………38

*Jackson v. United Parcel Service, Inc.*,

    643 F.3d 1081 (8th Cir. 2011)…………………………………………………………39

*King v. United States*,

    553 F.3d 1156 (8th Cir. 2009)…………………………………………………………34

4

*LaCroix v. Sears, Roebuck, and Co.*,

    240 F.3d 688 (8th Cir. 2001)……………………………………………………..35

*LeGrand v. Area Resources for Community and Human Services*,

    394 F.3d 1098 (8th Cir. 2005)…………………………………………………42

*McDonnell Douglas Corp. v. Green*,

    411 U.S. 792 (1973)…………………………………………………………..23, 34

*Miller v. Nat. Cas. Co.*,

    61 F.3d 627 (8th Cir. 1995)……………………………………………………25

*Minnihan v. Mediacom Commc'ns Corp.*,

    779 F.3d 803 (8th Cir. 2015)…………………………………………………..30

*Minteer v. Auger*,

    844 F.2d 569 (8th Cir. 1988)…………………………………………………...41

*Nitsche v. CEO of Osage Valley Elec. Co-op.*,

    446 F.3d 841 (8th Cir. 2006)…………………………………………………..42

*O'Brien v. Dept. of Agriculture*,

    532 F.3d 805 (8th Cir. 2008)…………………………………………………..42

*Parisi v. Boeing Co.*,

    400 F.3d 583 (8th Cir. 2005)…………………………………………………..37

*Peebles v. Potter*,

    354 F.3d 761 (8th Cir. 2004)…………………………………………………23, 37

*Reeves v. Sanderson Plumbing Products, Inc.*,

    530 U.S. 133 (2000)…………………………………………………………..22, 35

5

*Rehrs v. Iams Co.,*

      486 F.3d 353 (8th Cir. 2007)……………………………………………………...30

*Russell v. TG Missouri Corp.*,

      340 F.3d 735 (8th Cir. 2003)……………………………………………………...36

*Schaffhauser v. UPS*,

      794 F.3d 899 (8th Cir. 2015)……………………………………………………...24

*Shaver v. Independence Stave Co*.,

      350 F.3d 716 (8th Cir. 2003)……………….......................................................35

*Spears v. Mo. Dep't of Corr. & Human Res.*,

      201 F.3d 850 (8th Cir. 2000)……………………………………………………..35

*St. Mary's Hon. Ctr. v. Hicks*,

      509 U.S. 502 (1993)……………………………………………………………..35

*Stone v. McGraw Hill Financial, Inc*.,

      856 F.3d 1168 (8th Cir. 2017)…………………………………………………….41

*Stubbs v. Ford Motor Co.*,

      2008 WL 926404 (W.D. Mo. March 31, 2008)…………………………………….42

*Tademe v. St. Cloud State University*,

      328 F.3d 982 (8th Cir. 2003)……………………………………………………...41

*Tidwell v. Meyer's Bakeries, Inc.*,

      93 F.3d 490 (8th Cir. 1996)……………………………………………………...38, 39

*Tolliver v. Yeargan*,

      728 F.2d 1076 (8th Cir. 1984)…………………………………………………….41

6

*Wagner v. Campbell,*

    779 F.3d 761 (8th Cir. 2015)……………………………………………………...35

*Withers v. Johnson,*

    763 F.3d 998 (8th Cir. 2014)……………………………………………………...36

## <u>Statutes</u>

29 C.F.R. § 1630, App……………………………………………………………………25

29 C.F.R. § 1630.2………………………………………………………25, 26, 27, 28

29 C.F.R. § 1630.15………………………………………………………………………26

## <u>Rules</u>

Fed. R. Civ. P. 56………………………………………………………………………..8

L.R. 7.0………………………………………………………………………………..8

L.R. 56.1………………………………………………………………………………...8

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

PAIGE BELOATE,                          )
                                        )
             Plaintiff,        )
                                        )
            v.                )        Case No. 5:22-cv-06037-DGK
                                        )
LOUIS DEJOY, Postmaster General,        )
United States Postal Service,           )
                                        )
           Defendant.            )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED SUGGESTIONS IN SUPPORT

Defendant Louis DeJoy, Postmaster General for the United States Postal Service, pursuant to Fed. R. Civ. P. 56 and L.R. 7.0, 56.1(a), moves the Court for an order granting summary judgment in favor of Defendant on all claims alleged by Plaintiff Paige Beloate in her Complaint, Doc. 1. Defendant is referred to as "USPS" throughout briefing.

## I.      Overview

In March 2020 public life and working environments were upended as a result of the COVID-19 pandemic. The spread of the coronavirus and corresponding tens of thousands of deaths around the United States and the world led employers to implement various policies to quell the spread of the virus and protect the safety of workers, and in particular essential workers who were performing critical tasks that could not be undertaken from employees' homes or completely separately from other workers.

USPS mail carriers were one group of essential workers who continued to carry out critical functions for the country during the pandemic. As the virus progressed and the Centers for Disease Control ("CDC") learned more about the disease various guidance was disseminated to federal

8

agencies and the nation at large about how to slow the spread of the virus. One critical component of that guidance related to wearing face masks or other face coverings where social distancing could not be maintained. Accordingly, USPS implemented a face mask mandate in July 2020 to protect its postal carriers in the St. Joseph branch of the postal service.

Plaintiff Paige Beloate worked as a mail carrier in St. Joseph when this mandate was implemented and soon after it took affect obtained a letter from a medical provider stating that due to her PTSD diagnosis she could not wear a face mask. However, this July 2020 letter specifically stated that Beloate could and would wear a face shield in lieu of a mask. USPS immediately granted her the requested accommodation that allowed her to wear a face shield instead of a mask and provided her with a face shield to wear while she was working inside of the postal facility. Beloate raised no further issues with this accommodation until February 2021 when she was reminded by her supervisor, Jeff Crisafulli, that she needed to be wearing the face shield. During a meeting with Crisafulli Beloate flat out refused to do so, accused Crisafulli of violating her constitutional rights, and was sent home. She subsequently provided USPS with two letters from other healthcare providers that stated that she could not wear a mask—but said nothing to suggest that she could not wear a face shield. As a last ditch effort to avoid USPS's face covering policy and subvert the accommodation she had been granted in July 2020 Beloate retained Kathleen Dudley, a woman with no medical credentials whatsoever who prides herself on being a sovereign citizen and denies the existence of COVID-19 or the pandemic, to write her a letter stating that she could not wear a face shield at work.

Though Beloate provided no legitimate medical documentation to USPS suggesting that she could not safely wear a face shield, in April 2021 USPS agreed to eliminate essential functions of her job and allow her to continue delivering mail under a "light duty" assignment. After doing

9

this job for two days Beloate simply stopped showing up for work. About a month later she resigned.

Beloate now claims that she was subjected to disability discrimination and retaliation related to the USPS's actions in February-May 2021 after she refused to wear a face shield while working in the St. Joseph postal facilities. These claims are substantively meritless. Moreover, Beloate's actions, the "expert" she identified in Kathleen Dudley, and her public statements via Facebook posts reflect that this case has nothing to do with any disability Beloate had or legitimate medical restrictions, and instead is an attempt to wage war on USPS's COVID-19 policies and restrictions. USPS is entitled to summary judgment on all of Beloate's claims as discussed further below.

## II.    **Statement of Undisputed Facts**

1.      Beloate worked as a city mail carrier for USPS in St. Joseph, Missouri from 2018 until 2021. **Exhibit A** (Beloate Depo.), at 10:21-11:11.

2.      Beloate is disabled due to a Post Traumatic Stress Syndrome ("PTSD") diagnosis. Exhibit A, at 18:23-19:2.

### July 2020 Mask Policy and Accommodation

3.      On or about July 17, 2020 the Mid-America District of USPS issued a directive "to assist with the effort to control the spread of the [COVID-19] virus," which required "all employees working in facilities within the Mid-America District…to wear a face covering while at work." **Exhibit B** (July 2020 Mask Directive).

4.      The policy noted that "[t]he CDC recommends that people wear cloth face coverings in public settings and when around people who don't live in your household, especially when other social distancing measures are difficult to maintain." Exhibit B.

5.     The policy recognized that employees' "ability to maintain that 6 feet of social distance is difficult inside due to floor layout s and employees moving through the building" and thus "face masks will be required when inside a postal facility. That includes wearing while in hallways, elevators, retail counters and common spaces." Exhibit B.

6.     The policy did not require face masking while employees were working alone in confined spaces, working outside the facility (unless social distance could not be maintained) or while driving postal vehicles (as long as there was only one person in the vehicle). Exhibit B.

7.     This was the first mandate that went into effect that required face coverings to be work at the USPS facilities in St. Joseph, Missouri. Exhibit A, at 28:4-8.

8.     Beloate's supervisor informed her that she was required to wear a face mask after the July 2020 mandate went into effect and Beloate told him that for health reasons she could not wear a mask. Exhibit A, at 28:25-29:18.

9.     Her supervisor informed her that they would provide her with a face shield and allowed her to go back to work. Exhibit A, at 28:25-29:18.

10.    Ultimately her supervisor let her know that they could not provide her with a face shield in lieu of a mask without a doctor's note; as such, Beloate went to see Jackie Moser, a therapist, about her face covering limitations. Exhibit A, at 28:25-29:18.

11.    On or about July 22, 2020 Beloate provided USPS with a note from Moser, the subject of which was "Face Shield/Face Mask." **Exhibit C** (Moser Letter).

12.    The note from Moser stated as follows:

> Paige Beloate has been referred to my office for services. While talking with Ms. Beloate, we have discussed her difficulties with the face mask requirement for her and her fellow co-workers. Her issue is not with the mask mandate itself. But rather how she reacts to wearing the mask.

> Ms. Beloate has endured some very traumatic things in her past that are preventing her from wearing the mask. It is recommended that she be allowed to wear a face shield. The face shield is still difficult for her to wear. However, it causes less of a traumatic response for her. …
>
> Ms. Beloate understands the mandate to wear a face mask/shield and does not take this mandate lightly. She is also willing to follow the directive that has been given to her. If it is possible, I am recommending that Ms. Beloate be required to wear a face shield as it is less restrictive for her. This will suffice the mandate and will cause her less distress. …

Exhibit C.

13.     USPS granted Beloate the requested accommodation that exempted her from wearing a face mask but required her to wear a face shield. Exhibit A, at 142:19-23.

14.     USPS provided Beloate with a face shield the next week. Exhibit A, at 30:2-4.

15.     Between July 2020 and February 2021 Beloate was periodically reminded by her supervisor Robert that she needed to be wearing her face shield. Exhibit A, at 32:17-23.

### February 2021 Face Shield Dispute

16.     In February 2021 Beloate got a new supervisor, Jeff Crisafulli. Exhibit A, at 34:22-24.

17.     On or about February 13, 2021 Crisafulli called Beloate into his office because she was not correctly wearing a face shield. Exhibit A, at 47:5-19.

18.     Crisafulli instructed Beloate that she was required to wear a face shield to continue working. Exhibit A, at 43:22-25.

19.     Beloate refused to wear a face shield. Exhibit A, at 48:14-49:21.

20.     Beloate told Crisafulli that the requirement that she wear a face covering was a violation of her constitutional rights. Exhibit A, at 48:21-49:1.

21.     Crisafulli put Beloate "off the clock" on February 13, 2021 due to her refusal to wear a face shield. **Exhibit D** (Crisafulli Affidavit), at 110.

12

22. Beloate used accrued paid time off and was permitted to take advanced leave to continue being paid during her time on leave. Complaint at ¶ 15.

23. If Beloate had agreed to correctly wear a face shield on February 13, 2021 she would have been permitted to continue working. Exhibit A, at 48:14-20.

24. That same day Beloate took to Facebook to instruct her followers that "you will either confront your oppressors or be oppressed by them" and that "if you believe, as I do, that Psalm 91 declares that our Creator, the Lord Jesus Christ, is our protector, both from tyrants as well as pestilences, then you are exempt from any mandate requiring you to do anything pushed upon you during the plandemic/scamdemic under the protections of the First Amendment." **Exhibit E** (February 13, 2021 Facebook Posts).

25. On the day Crisafulli told Beloate needed to be wearing a face covering he also told at least one other employee that she also needed to put on a face covering. Exhibit A, at 35:2-23, 39:5-22.

26. Beloate believes that Crisafulli told her and the other employee to wear the face coverings because he was "bullying" them but could not say why she believed he chose to bully her and the other employee specifically. Exhibit A, at 37:7-18.

27. It seemed kind of random to her. Exhibit A, at 37:19-20.

28. Beloate testified at her deposition that she could not articulate any reason for her belief that the way she was treated at USPS was a result of her PTSD diagnosis. Exhibit A, at 140:18-141:7 ("I don't – I don't know. I don't – I don't have a good answer for that. …what else can it be…").

13

## Medical Notes Provided by Beloate in February 2021

29.     After she was put off the clock Beloate provided USPS with a note from Green Family Chiropractic dated February 17, 2021 which stated that Beloate was "not advised to wear a mask because of health history." **Exhibit F** (Green Family Chiropractic Letter).

30.     The note from Green Family Chiropractic did not indicate that Beloate could not wear a face shield. Exhibit F.

31.     Beloate also provided USPS a note from Lisa Fisher, Licensed Professional Counselor, dated February 18, 2021 which stated that Beloate had been "diagnosed with Chronic PTSD" and "requires a mask exemption." **Exhibit G** (Fisher Letter).

32.     The note from Fisher did not indicate that Beloate could not wear a face shield. Exhibit G.

33.     Beloate told both Fisher and Green Family Chiropractic that the problem she was having with USPS related specifically to the face shield and that she already had a mask exemption. Exhibit A, at 54:21-55:19, 59:9-60:5.

34.     In addition to stating that Beloate could not wear a mask Fisher stated that "[f]or her mental well-being, she also needs to be restricted to no more than 9 hour days and a 45 hour work week, with the flexibility to be able to pick up her children from daycare by 5:30 pm." Exhibit G.

35.     With respect to the restricted work hours, Beloate testified that "we all [referring to a series of postal employees] got our restriction so that we could just be off, so we could just work 10 hours and go home." Exhibit A, at 61:8-17.

36.     She referred to one other specific employee who made the same request: "Crystal Kennedy, she's a carrier there. She had the exact same doctor's note that I had. We went at the same time. We had the same doctor's note." Exhibit A, at 61:18-25.

37.     According to Beloate, "Obviously as a mother that is something I had to do. I can't just leave them." Exhibit A, at 62:14-24.

**Documentation from Kathleen Dudley and Request for Accommodation**

38.     Beloate reached out to Kathleen Dudley, a reflexologist and palm reader, at the end of March 2021 in an effort to obtain some sort of documentation to support her claim that she was being harmed by the face shield requirement. Exhibit A, at 66:16-67:3; **Exhibit H** (Dudley Depo.), at 25:15-16.

39.     Dudley is not part of the American Medical Association and is not licensed to provide any sort of medical care. Exhibit H, at 20:11-22.

40.     Dudley identifies herself as a sovereign citizen and asserts that "any legal authority is just a slave master system" and "I'm not a slave." Exhibit H, at 30:25-31:20.

41.     Dudley created a YouTube video titled "Tutorial on How to Use Letter of Exemption for Not Wearing Face Covering." Exhibit H, at 28:2-6.

42.     In this video, she "explain[ed] to people [] this scam regarding COVID, and then also the unlawful face masks" and told listeners "how to protect [their] own rights to not wear a mask through an exemption letter."  Exhibit H, at 28:20-29:8.

43.     Dudley believes that the COVID-19 pandemic "was never proven" and that pandemic restrictions were "actually a crime." Exhibit H, at 29:9-30:4.

44.     When asked what qualifies her to provide education on COVID-19 and face covering requirements, Dudley responded, "Because I have freedom of speech, the First

Amendment…and I have the every right to speak my opinion on anything and everything in a free country. There is no one who has any dominion over me, and for that matter, over anyone." Exhibit H, at 30:5-13.

45.     On or about March 29, 2021, Dudley completed a Medical Information and Restriction Assessment form from USPS and in answering the first question, "Does the employment have a physical or mental impairment?," crossed out the word "mental." Exhibit H, at 44:10-16; **Exhibit I** (Medical Information and Restriction Assessment).

46.     Dudley asserts that Beloate has no mental impairment. Exhibit H, at 44:10-16.

47.     Rather, "the impairment is that when wearing a face mask, it causes difficulty breathing." Exhibit H, at 44:10-16.

48.     Dudley has no idea whether Beloate has any mental impairment or whether Beloate was ever diagnosed with PTSD. Exhibit H, at 44:17-45:10.

49.     Dudley believes that wearing a face covering of any sort is a health risk to any person wearing it:

> In the case of masks, it's a very simple science. We would be dead if we didn't breathe. When our oxygen level is cut down, we experience symptoms of shortness of breath, headaches, dizziness, some people pass out. So it doesn't take a Ph.D. and it doesn't take a doctor in the American Medical Association to look at what is taking place when a mask is put on someone's face. 40 percent of the oxygen is cut off. So there's no assessment. What it is, it's just logic, and it's just a knowing of basic A, B, Cs.

Exhibit H, at 22:7-25.

50.     Around March 29, 2021 Dudley also provided a letter on behalf of Beloate and represented that "[a]s a health care provider" she was "instructing that Paige Renea Beloate not wear a face covering or face shield for health reasons." (internal punctuation omitted). **Exhibit J** (Dudley Letter).

16

51. Dudley acknowledges that a mask and a face shield "look different" and while she has no "scientific comparison about how much oxygen is diminished in comparison from a mask to a face shield," "they are both intrusions and impact the capacity for us to breathe and take in oxygen." Exhibit H, at 43:15-44:1.

52. Dudley contends that "no one can safely wear a face shield…without there being health issues." Exhibit H, at 52:6-18.

53. Throughout the pandemic Dudley has provided face covering exemption letters to functionally anyone who requested one from her—whether the requestor had an underlying health condition was completely irrelevant to Dudley's provision of the letter. Exhibit H, at 34:6-19, 35:11-24.

54. Beloate submitted a formal request for reasonable accommodation on March 29, 2021. **Exhibit K** (March 29, 2021 Request for Accommodation).

55. In this request she did not seek any specific accommodation with respect to the face shield but noted "I'm able to perform all of my duties and am willing to work. I don't know what needs to be done next to get [] back to work." Exhibit K.

**<u>DRAC Review and Accommodations</u>**

56. Beloate's request to be exempted from all face covering requirements was referred to the District Reasonable Accommodation Committee ("DRAC") per USPS policy. **Exhibit L** (December 2020 Policy Re Referral to DRAC).

57. The DRAC issued its decision to Beloate in a letter dated April 29, 2021. **Exhibit M** (December 29, 2021 DRAC Letter).

58. The letter discussed that neither the letter from Fisher nor the letter from Green Family Chiropractic indicated that Beloate could not wear a face shield. Exhibit M.

59.    The letter incorrectly identified Fisher as Moser. Exhibit M.

60.    The DRAC further discussed that "Dudley is not a medical doctor, provides no medical or other basis for her '40%' opinion or other opinions regarding face shields, and is at odds with your own mental health professionals' opinions regarding the wearing of face shields." Exhibit M.

61.    Based on Dudley's opinions and Beloate's refusal to wear a face shield at work the DRAC concluded that "there is no way to currently accommodate you to perform all the essential functions of your job during the pandemic" because "there is no way to ensure social distancing in the facility as you are exposed to colleagues, and they you, on the floor, in the break room, at the clock, in the restroom, etc., while indoors." Exhibit M.

62.    However, the DRAC went on to discuss that Beloate would be "receiving a light duty assignment for outside carrier work that does not include indoor casing or other indoor work. This likewise qualifies as a reasonable accommodation at least as far as the work you can perform, as it provides work within your restrictions and within your job description, just with a change of hours. …no matter how defined, it allows you to work essentially full-time within your restrictions." Exhibit M.

63.    In the DRAC letter the committee also addressed Beloate's purported restriction with respect to being off work by 5:30 to pick up her children and noted that Fisher "provides no medical rationale for these restrictions, nor how childcare relates to any potential medical issue." Exhibit M.

64.    However, the DRAC also stated that if she wished to provide medical information to support the medical necessity of the restriction, "I invite you to do so and the DRAC will review that further." Exhibit M.

65. On April 30, 2021 the DRAC's decision was also sent to Beloate in a letter from Crisafulli. **Exhibit N** (April 30, 2021 Crisafulli Letter).

66. Crisafulli's letter noted that the DRAC was "not able to develop a reasonable accommodation to allow you to perform all the essential functions of your carrier job including but not limited to casing to delivering," but "instead will provide light duty to you although you have not requested that in writing pursuant to and as required by the labor contract." Exhibit N.

67. One of Beloate's instructions related to her light duty accommodation was that "[w]hen delivering, at work, and/or on USPS time, it is imperative that you maintain social distancing from all customers and every other person you encounter. You must take this seriously and courteously prevent people from approaching you." Exhibit N.

68. Crisafulli directed Beloate to report back to work on or before May 10, 2021. Exhibit N.

### Beloate's Return to Work on May 10 and May 11

69. Beloate returned to work on May 10. Exhibit A, at 87:23-25.

70. Beloate got off work at 5:30 on May 10. Exhibit A, at 62:11-13, 89:12-15; **Exhibit O** (May 10 and 11 Timesheets).

71. Beloate also worked on May 11. Exhibit A, at 91:25-92:2.

72. Beloate got off work at 5:30 on May 11. Exhibit A, at 62:11-13; Exhibit O.

73. On May 10 or 11 Crisafulli yelled at Beloate because she was talking with a coworker in the parking lot while not wearing a face covering. Exhibit A, at 123:17-124:18.

74. On May 11 Crisafulli hand-delivered Beloate a letter noting that he was treating her request to be off at 5:30 as a request for reasonable accommodation based on her assertion that she had a medical need to be off and had referred the matter to the DRAC. **Exhibit P** (May 11 Letter).

19

75. Crisafulli stated that "I have agreed to your request on an interim basis until DRAC can make a recommendation and I can make a final decision." Exhibit P.

76. Beloate testified that to deliver this letter Crisafulli "followed" her on her route for ten or fifteen minutes, handed her the letter, and left. Exhibit A, at 107:20-108:2.

77. Beloate acknowledges that USPS mail carriers will periodically undergo monitoring of their mail delivery as part of their evaluations. Exhibit A, at 108:3-23.

78. After May 11 Beloate stopped showing up for work. Exhibit A, at 121:22-122:6.

79. On May 14, 2021 Beloate filed her EEO Complaint. **Exhibit Q** (EEO Complaint).

80. Beloate explained during her deposition that she was dissatisfied with the light duty accommodation because she perceives light duty as "a term that they give to people who can't carry their full route. And if you can't carry your full route, you're treated very badly." Exhibit A, at 83:10-17.

81. Beloate's interpretation of the light duty accommodation she received is that it was USPS's "hoop to jump through so they could legally bully" her. Exhibit A, at 134:9-22.

82. Beloate could not say whether she believed the specific work assignment she was given (that is, not going into the post office to case her mail but picking her mail up on the dock and delivering it) would have been acceptable to her if it had not been called "light duty." Exhibit A, at 133:16-134:15.

83. After approximately two weeks of failing to report on May 24, 2021 USPS sent her a letter instructing her that she was to report to work the next day and "bring satisfactory and acceptable evidence of her inability to report to work" in accordance with the applicable collective bargaining agreement. **Exhibit R** (Absence Letters).

84. Similar letters were sent to her on May 25 and May 26. Exhibit R.

85.     However, Beloate failed to appear to report in response to any of the letters. Exhibit A, at 127:5-129:9.

**Beloate's Resignation**

86.     On June 8, 2021 Beloate came into the office to provide a letter of resignation. **Exhibit S** (Letter of Resignation).

87.     Beloate testified that she decided to resign on June 8 because she "feared going back and being harassed like [she] had seen with other people." Exhibit A, at 137:25-138:8.

88.     Beloate testified during her deposition that all of the postal carriers in St. Joseph were subjected to harassing and rude supervisors who just wanted to move up the supervisory ladder within USPS. Exhibit A, at 139:10-15.

89.     She stated that she "knew if [she] went back, [she] was going to be harassed." Exhibit A, at 140:4-11.

90.     Beloate claims that approximately four times between March and May 2021 USPS employees would see her working a different job for the City of St. Joseph and take pictures of her. Exhibit A, at 124:19-125:13.

## III.    Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis of its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). *See also* Fed. R. Civ. P. 56(c). If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324, quoting from former Fed. R. Civ. P. 56(e)(2). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007). The non-movant must present evidence that is "significantly probative," and not "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

The Supreme Court has reiterated that a district court should not "treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 148 (2000). "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011). As the Eighth Circuit explained in *Beardsall v. CVS Pharmacy, Inc*., 953 F.3d 969, 973 (8th Cir. 2020), "Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." (internal quotation marks omitted).

## IV. Beloate Was Not Subjected to Disability Discrimination or Retaliation by USPS

Beloate makes two claims in this lawsuit—first, disability discrimination and second, retaliation. The undisputed facts reflect that USPS is entitled to summary judgment on both of these claims.

### A. USPS Provided Accommodations for Beloate's Alleged Disability and Did Not Discriminate Against Her (Count I)

Beloate's first claim is for disability discrimination related to her diagnosis of Post Traumatic Stress Syndrome ("PTSD"). SOF 2. The Rehabilitation Act[1] provides "the exclusive remedy for employment discrimination based on a disability for federal employees." *Ahmed v. Napolitano*, 825 F.Supp.2d 112, 115 (D.D.C. 2011). The Rehabilitation Act encompasses several distinct categories of claims for employment discrimination based on discrimination, including disparate treatment and failure-to-accommodate. *Peebles*, 354 F.3d at 765-66. The differences are not insignificant:

> Depending on which kind of discrimination is at issue, different burden-shifting analyses are applied. The allocation of the burdens of production and persuasion between the plaintiff and the defendant, in turn, affects the analysis of a summary judgment motion made by the defendant.

*Id*.

As discussed in more detail *infra*, absent direct evidence of employment discrimination, a court must analyze a plaintiff's Rehabilitation Act disparate treatment discrimination claims under the *McDonnell Douglas* burden-shifting framework. *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). However, a plaintiff alleging a failure-to-accommodate violation of the Rehabilitation Act need not engage with the traditional *McDonnell Douglas* framework. Instead, in such cases, the Eighth Circuit has applied "a modified burden-shifting analysis." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).

---

[1] In 1992, Congress amended the Rehabilitation Act to provide that the standards used to judge "non-affirmative action employment discrimination" under the Rehabilitation Act "shall be the standards applied under" the Americans With Disabilities Act ("ADA"). 29 U.S.C. § 791(g). Thus, the disability standards set forth in the ADA – with some notable, limited exceptions – are used to determine whether a violation of the Rehabilitation Act has occurred. *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). As such, "[s]ince the ADA and the Rehabilitation Act are 'similar in substance,' [a court may] treat the case law interpreting them as 'interchangeable.'" *Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013). Accordingly, USPS will cite to cases under both the Rehabilitation Act and the ADA herein.

### 1. USPS Accommodated for Beloate's Alleged Disability

Beloate contends that USPS failed to accommodate her disability, PTSD, by (1) putting her off the clock on February 13, 2021 when she refused to wear a face shield and (2) making insufficient allowances for her to leave work at 5:30 pm to pick up her children when she returned to work in May 2021.

Under the modified burden-shifting approach for assessing purported reasonable accommodation violations, the plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. UPS*, 794 F.3d 899, 905 (8th Cir. 2015). The "prima facie case of discrimination" requires a plaintiff to show she is a qualified individual with a disability within the meaning of the Rehabilitation Act who has suffered an adverse employment action. *Fenney,* 327 F.3d at 712. A "qualified individual" is an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*.

> [I]f the employee cannot perform the essential functions of the job without an accommodation, he must only make a "facial showing that a reasonable accommodation is possible."

*Id*. (quoting *Benson v. Nw. Airlines, Inc*., 62 F.3d 1108, 1112 (8th Cir. 1995)). At that point, "[t]he burden of production then shifts to the employer to show that it is unable to accommodate the employee." *Fenney*, 327 F.3d at 712.

Employers and employees have a "shared responsibility…to resolve accommodation requests." *E.E.O.C. v. Convergys Customer Management Group, Inc.*, 491 F.3d 790, 795 (8th Cir. 2007). *See also Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). The interactive process is informal and flexible, enabling both employer and employee to identify the employee's "precise limitations resulting from the disability and potential reasonable accommodations that could

overcome those limitations." 29 C.F.R. § 1630.2(o)(3). When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation. *Miller v. Nat. Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995); 29 C.F.R. § 1630, App.

### a. Beloate Failed to Identify any Medical Need to Be Exempted from the Face Shield Requirement but USPS Accommodated Her Nevertheless

In July 2020 USPS implemented a face covering requirement that applied to the St. Joseph post office out of which Beloate was based. SOF 3. The policy required employees to wear a face mask while working in areas where social distancing was not possible. SOFs 4-5. Within days after the policy being implemented Beloate provided documentation from a Jackie Moser, a therapist, which stated that she should not be required to wear a face mask due to her PTSD. SOFs 10-12. However, the letter provided specifically noted that she could wear a face shield with this diagnosis. SOF 12. Accordingly, USPS promptly granted her an accommodation that exempted her from the face mask requirement but required her to wear a face shield. SOF 13. Beloate raised no issues with this accommodation until February 13, 2021. SOFs 14-15.

Beloate's first request for an accommodation to be exempted from all face covering requirements (including the face shield accommodation) was made when her supervisor instructed her that she had to wear her face shield in February 2021. SOF 17. This request did not come up organically but was made in the course of an argument between Beloate and her supervisor after she was instructed to put on her face shield and refused to do so. SOFs 17-20. During that argument Beloate told her supervisor that the requirement that she wear a face shield violated her "constitutional rights." SOF 20. Beloate's supervisor put her "off the clock" because she refused to comply with the requirement that she wear the face shield. SOFs 21-23. That same day Beloate took to Facebook to instruct her followers that "you will either confront your oppressors or be

25

oppressed by them" and that "if you believe, as I do, that Psalm 91 declares that our Creator, the Lord Jesus Christ, is our protector, both from tyrants as well as pestilences, then you are exempt from any mandate requiring you to do anything pushed upon you during the plandemic/scamdemic under the protections of the First Amendment."[2] SOF 24.

Management's decision to temporarily put Beloate off the clock while a determination was made about how to proceed regarding the face shield did not amount to discrimination or a failure to engage in the interactive process. Leave without pay[3] can constitute a reasonable accommodation and has been deemed by other courts to be a reasonable accommodation with respect to addressing employee restrictions related to face coverings necessitated by the COVID-19 pandemic. *See, e.g., Bezzina v. United Airlines, Inc.*, 2022 WL 878921, at *5-9 (C.D. Cal. Feb. 24, 2022) ("the accommodation offered to Plaintiff—extended leave without pay until he is able to return to work without having to wear a mask and the opportunity to apply for other positions— was reasonable"). Here, while Beloate may not have liked being put on temporary leave, it was an acceptable temporarily accommodation for USPS to employ as there was no way for her to abide by USPS's COVID-19 policies while wearing no face covering inside USPS facilities.[4]

---

[2] Beloate makes no claims in this case related to any purported religious discrimination.

[3] Notably, Beloate was not forced to take leave without pay. Beloate used accrued paid time off and was permitted to take advanced leave to continue being paid during her time on leave. SOF 22.

[4] Moreover, employers are permitted to deny accommodations where the employee seeking the accommodation "pose[s] a direct threat to the health or safety of the individual or others in the workplace." 29 C.F.R. § 1630.15(b)(2). A "direct threat" is defined as a "significant risk of substantial harm to the health or safety of the individual or others" and is "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). USPS policy reflecting the best medical knowledge and CDC guidance as of spring 2021 mandated face coverings when social distancing was not possible in order to control the spread of the COVID-19 virus. SOFs 3-5. "In assessing the reasonableness of [an employer's] actions, the views of public health authorities, such as the…CDC…are of special weight and authority." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). Here, even if the temporary leave from February-May is construed as a temporary denial of an

More to the point, however, USPS was not required to simply accept Beloate's spontaneous assertion on February 13, 2021 that she could not wear a face shield. *E.E.O.C. v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1094–95 (6th Cir. 1998) ("[T]he employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement. If this were not the case, every employee could claim a disability warranting a special accommodation yet deny the employer the opportunity to confirm whether a need for the accommodation exists."). The interactive process for identifying a reasonable accommodation is intended to allow the employer to "identify the precise limitations resulting from the disability." 29 C.F.R. § 1630.2(o)(3).

At the time Beloate was put off the clock USPS had a letter from her health care provider stating that she could wear a face shield at work. SOFs 10-12. Four days after she was put off the clock she obtained another letter from her chiropractor reflecting that she was "not advised to wear a mask because of health history." SOF 29. The next day she obtained another note from her counselor stating that she was "diagnosed with Chronic PTSD" and "requires a mask exemption." SOF 31. Neither of these providers suggested that Beloate could not wear a face shield as USPS required. SOFs 30, 32. Moreover, Beloate acknowledges that she told both of these providers that the problem she was having with USPS related specifically to the face shield and that she already had a mask exemption. SOF 33. Despite this knowledge, neither provider indicated that Beloate could not wear a face shield. SOFs 30, 32-33.

A "reasonable accommodation" is a "modification[] or adjustment[]…that enable[s] an individual with a disability" to perform their job or enjoy equal benefits or privileges of

accommodation the denial was permissible because the CDC guidance at the time reflected that face coverings were necessary to prevent the spread of COVID-19 and failure to wear a face covering amounted to a direct threat to Beloate and her coworkers.

employment. 29 C.F.R. § 1630.2(o)(1). No evidence suggests that any of Beloate's medical providers ever indicated that she required a "modification or adjustment" to the requirement that she wear a face shield at work. The sole accommodation Beloate required, as reflected by three notes from her healthcare providers, was that she be exempted from the requirement to wear a face mask. At no point during the relevant period was Beloate required to wear a face mask. As such, Beloate has failed to set forth any medical evidence to support her claim that she was entitled to any reasonable accommodation that USPS denied with respect to the face covering requirements.

Because her medical providers consistently refused to validate Beloate's claim that she could not wear a face shield Beloate began to research other options on her own. SOF 38. She ultimately reached out to Kathleen Dudley, a New Mexico-based reflexologist and palm reader, at the end of March 2021 in an effort to obtain some sort of documentation to support her claim that she was being harmed by the face shield requirement. SOF 38. Dudley is not part of the American Medical Association and is not licensed to provide any sort of medical care. SOF 39. Dudley identifies herself as a sovereign citizen and asserts that "any legal authority is just a slave master system" and "I'm not a slave." SOF 40.

Dudley created a YouTube video titled "Tutorial on How to Use Letter of Exemption for Not Wearing Face Covering." SOF 41. In this video, she "explain[ed] to people [] this scam regarding COVID, and then also the unlawful face masks" and told listeners "how to protect [their] own rights to not wear a mask through an exemption letter." SOF 42. Dudley believes that the COVID-19 pandemic "was never proven" and that pandemic restrictions were "actually a crime." SOF 43. When asked what qualifies her to provide education on COVID-19 and face covering requirements, Dudley responded, "Because I have freedom of speech, the First Amendment…and

I have the every right to speak my opinion on anything and everything in a free country. There is no one who has any dominion over me, and for that matter, over anyone." SOF 44.

On or about March 29, 2021, Dudley completed a Medical Information and Restriction Assessment form from USPS and in answering the first question, "Does the employment have a physical or mental impairment?," crossed out the word "mental." SOF 45. Dudley asserts that Beloate has no mental impairment. SOF 46. Rather, "the impairment is that when wearing a face mask, it causes difficulty breathing." SOF 47. Dudley has no idea whether Beloate has any mental impairment or whether Beloate was ever diagnosed with PTSD; she believes that wearing a face covering of any sort is a health risk to any person wearing it:

> In the case of masks, it's a very simple science. We would be dead if we didn't breathe. When our oxygen level is cut down, we experience symptoms of shortness of breath, headaches, dizziness, some people pass out. So it doesn't take a Ph.D. and it doesn't take a doctor in the American Medical Association to look at what is taking place when a mask is put on someone's face. 40 percent of the oxygen is cut off. So there's no assessment. What it is, it's just logic, and it's just a knowing of basic A, B, Cs.

SOFs 48-49. Around March 29, 2021 Dudley also provided a letter on behalf of Beloate and represented that "[a]s a health care provider" she was "instructing that Paige Renea Beloate not wear a face covering or face shield for health reasons." SOF 50.

Dudley acknowledges that a mask and a face shield "look different" and while she has no "scientific comparison about how much oxygen is diminished in comparison from a mask to a face shield," "they are both intrusions and impact the capacity for us to breathe and take in oxygen." SOF 51. Dudley contends that "no one can safely wear a face shield…without there being health issues." SOF 52. Throughout the pandemic Dudley has provided face covering exemption letters to functionally anyone who requested one from her—whether the requestor had an underlying health condition was completely irrelevant to Dudley's provision of the letter. SOF 53.

Beloate's request to be exempted from all face covering requirements was referred to the District Reasonable Accommodation Committee ("DRAC") per USPS policy. SOF 56. The DRAC issued its decision to Beloate in a letter dated April 29, 2021. SOF 57. The letter discussed that neither the letter from Fisher nor the letter from Green Family Chiropractic indicated that Beloate could not wear a face shield. SOF 58. The DRAC further discussed that "Dudley is not a medical doctor, provides no medical or other basis for her '40%' opinion or other opinions regarding face shields, and is at odds with your own mental health professionals' opinions regarding the wearing of face shields." SOF 60. Based on Dudley's opinions and Beloate's refusal to wear a face shield at work the DRAC concluded that "there is no way to currently accommodate you to perform all the essential functions of your job during the pandemic" because "there is no way to ensure social distancing in the facility as you are exposed to colleagues, and they you, on the floor, in the break room, at the clock, in the restroom, etc., while indoors." SOF 61. However, the DRAC went on to discuss that Beloate would be "receiving a light duty assignment for outside carrier work that does not include indoor casing or other indoor work. This likewise qualifies as a reasonable accommodation at least as far as the work you can perform, as it provides work within your restrictions and within your job description, just with a change of hours. …no matter how defined, it allows you to work essentially full-time within your restrictions."[5] SOF 62.

_____

[5] Importantly, "for established public policy reasons, '[a]n employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.' *Rehrs v. Iams Co.,* 486 F.3d 353, 358 (8th Cir.2007) (alteration in original) (quotation and internal quotation omitted). We have held that 'to find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of the employers.' *Id.* (quotation omitted)." *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 812 (8th Cir. 2015). As such, USPS's decision in April 2021 to allow Beloate to work in a light duty capacity is not evidence that her doing so fulfilled all essential functions of her role (which it did not, as one of the essential functions of the role is casing mail for delivery), or evidence that this accommodation could or

30

On April 30, 2021 the DRAC's decision was also sent to Beloate in a letter from Crisafulli. SOF 65. This letter noted that the DRAC was "not able to develop a reasonable accommodation to allow you to perform all the essential functions of your carrier job including but not limited to casing to delivering," but "instead will provide light duty to you although you have not requested that in writing pursuant to and as required by the labor contract." SOF 66. Crisafulli directed Beloate to report back to work on or before May 10, 2021. SOF 68.

As previously discussed, Beloate had been working under an accommodation that exempted her from wearing a mask but required her to wear a face shield since July 2020. When she submitted her formal reasonable accommodation request on March 29, 2021 she did not seek any specific further accommodation with respect to the face shield but noted "I'm able to perform all of my duties and am willing to work. I don't know what needs to be done next to get [] back to work." SOFs 54-55. USPS provided her accommodations first by putting her on leave and then by assigning her to light duty which allowed her to avoid the face shield requirement altogether. SOF 62. Beloate never requested any further accommodation with respect to the face shield and simply stopped showing up for work two days after beginning the light duty assignment.

An employee cannot expect their employer "to read her mind and know she secretly wanted [a different accommodation] and then sue [] for not providing it." *Evans v. Cooperative Response Center, Inc.*, 996 F.3d 539, 547 (8th Cir. 2021). Here, Beloate was first informally and then formally provided with accommodations to allow her to continue as a postal employee while not wearing a face shield. While the accommodations she received (temporary leave and then light duty) were perhaps not the accommodations she desired she never raised any specific issues with

---

should have been provided immediately in February 2021 when Beloate first objected to wearing the face shield.

them or suggested any other accommodation that would have permitted her to continue working while abiding by USPS's COVID-19 restrictions. Moreover, she never at any point provided USPS with any valid medical documentation that indicated that her PTSD actually prevented her from working with a face shield. In fact, three of her own medical providers provided USPS documentation that indicated that the accommodation she was provided in July 2020 (that is, being exempted from the mask requirement) was sufficient to meet her needs. SOFs 12, 29-32. There is simply no evidence in the record that suggests that USPS failed to meet its obligations to reasonably accommodate Beloate's disability.

### b. Beloate Failed to Provide Evidence of a Medical Need to Leave Work by 5:30 but USPS Accommodated Her Nevertheless

Beloate next claims that USPS failed to accommodate her need to be off work by 5:30 pm each day to pick up her children from daycare. However, Beloate acknowledges that she was not required to work after 5:30 on May 10 or 11, 2021—the only two days she worked for USPS after claiming that she required this accommodation. SOFs 70, 72, 78.

The letter Beloate provided to USPS from Lisa Fisher, her counselor, on February 18, 2021 stated that in addition to requiring a mask exemption, "[f]or her mental well-being, she also needs to be restricted to no more than 9 hour days and a 45 hour work week, with the flexibility to be able to pick up her children from daycare by 5:30 pm." SOF 34. At the time this letter was provided Beloate was on leave due to her refusal to wear a face shield in USPS facilities.

In the DRAC letter dated April 29, 2021 the committee addressed this purported restriction and noted that Fisher "provides no medical rationale for these restrictions, nor how childcare relates to any potential medical issue." SOF 63. However, the DRAC also stated that if she wished to provide medical information to support the medical necessity of the restriction, "I invite you to do so and the DRAC will review that further." SOF 64. During her deposition Beloate functionally

32

acknowledged that this request did not relate to any specific medical issue, but "we all [referring to a series of postal employees] got our restriction so that we could just be off, so we could just work 10 hours and go home." SOF 35. She referred to one other specific employee who made the same request: "Crystal Kennedy, she's a carrier there. She had the exact same doctor's note that I had. We went at the same time. We had the same doctor's note." SOF 36. According to Beloate, "Obviously as a mother that is something I had to do. I can't just leave them." SOF 37.

While USPS did not provide Beloate a formal reasonable accommodation related to this request, they did approve her request to be off at 5:30 when she returned to work on May 10 and 11. SOFs 70, 72, 74. On May 11 Crisafulli hand-delivered her a letter noting that he was treating her request to be off at 5:30 as a request for reasonable accommodation based on her assertion that she had a medical need to be off and had referred the matter to the DRAC.[6] SOF 74. Crisafulli stated that "I have agreed to your request on an interim basis until DRAC can make a recommendation and I can make a final decision." SOF 75.

After May 11 Beloate stopped showing up for work. SOF 78. After approximately two weeks of failing to report on May 24, 2021 USPS sent her a letter instructing her that she was to report to work the next day and "bring satisfactory and acceptable evidence of her inability to report to work" in accordance with the applicable collective bargaining agreement. SOF 83. Similar letters were sent to her on May 25 and May 26. SOF 84. However, Beloate failed to appear to report in response to any of the letters. SOF 85. On June 8, 2021 she came into the office to provide a letter of resignation. SOF 86.

---

[6] This was consistent with the DRAC's April 29 letter which invited Beloate to submit additional medical information related to the purported restriction. SOF 64.

At the time Beloate stopped showing up for work she had been granted a temporary accommodation with respect to the 5:30 leave time and had, for both days she worked after providing the Fisher letter requesting the 5:30 leave time, been permitted to clock out by 5:30 pm. SOFs 70, 72, 74. There is no evidence in the record that suggests that USPS failed to engage in the interactive process or provide Beloate an accommodation with respect to her work hour restriction. As such, USPS is entitled to summary judgment on her claim related her need to leave work by 5:30.

### 2. Beloate Was Not Subjected to Intentional Discrimination Due to Her PTSD

Beloate also suggests in the Complaint that she was subjected to disparate treatment as a result of her PTSD diagnosis. Beloate does not allege that she has any direct evidence of discrimination or retaliation. Therefore, her claims are subject to the familiar burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817 (1973). Applying the *McDonnell Douglas* test, Beloate bears the initial burden of establishing a *prima facie* case of discrimination and retaliation. *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019). To make a *prima facie* case for disability discrimination under *McDonnell Douglas*, Beloate generally must establish:

(1)     she is a member of a protected group (*i.e.*, she has a disability),

(2)     she was meeting the legitimate expectations of her job duties,

(3)     she suffered an adverse employment action or actions, and

(4)     a causal connection exists between her membership in the protected group(s) and the adverse action(s).

*King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) (disability discrimination).

If (and only if) Beloate establishes such *prima facie* cases, then the burden shifts to USPS to articulate legitimate reasons for each of its adverse actions. *Id.* Once USPS articulates such

34

reasons the burden shifts back to Beloate to show that USPS's stated reasons are "merely a pretext for discrimination or retaliation." *Id*. However, "[d]espite this shifting of the burden of production, 'the plaintiff at all times bears the ultimate burden of persuasion.'" *Id.* (*quoting, in part*, *St. Mary's Hon. Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993). And, "[t]he ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000).

"'An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects.'" *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2018) (quoting *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015)). "'[M]inor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action.'" *Id.* (quoting *Spears v. Mo. Dep't of Corr. & Human Res*., 201 F.3d 850, 853 (8th Cir. 2000)). Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities." *LaCroix v. Sears, Roebuck, and Co*., 240 F.3d 688, 691 (8th Cir. 2001). Consequently, "[conduct] that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Shaver v. Independence Stave Co*., 350 F.3d 716, 721 (8th Cir. 2003).

The only adverse action identified by Beloate is that she was put off the clock from February 13 until May 10, 2021. *See AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (collecting relevant case law and discussing that commencing performance evaluations, public ridicule, denying access to work tools, exclusion from meetings, and threatening discipline do not

35

constitute adverse employment actions). USPS did not put Beloate off the clock because she had PTSD; rather, Beloate was put off the clock because she refused to comply with the USPS's requirement that she wear a face covering while inside the postal building and specifically failed to comply with the accommodation she had been granted in July 2020 that allowed her to wear a face shield in lieu of a mask. SOFs 3-5, 18-23. *See Withers v. Johnson*, 763 F.3d 998 (8th Cir. 2014) (discussing that discriminatory animus is not shown where an employee fails to follow an employer's policies); *Russell v. TG Missouri Corp.*, 340 F.3d 735, 742 (8th Cir. 2003) (same). As set forth above, USPS's decision to send her home when she would not comply with this requirement amounted to an acceptable temporary accommodation in light of the extraordinary circumstances related to the COVID-19 pandemic, the then-existing CDC guidance related to face coverings, and risks to all postal employees related to the spread of the virus. Beloate never provided any acceptable medical documentation that indicated that she could not wear a face shield at work. Despite her failure to provide such documentation USPS ultimately let her return to work under the light duty restrictions.

Moreover, Beloate testified at her deposition that she could not articulate any reason for her belief that the way she was treated at USPS was a result of her PTSD diagnosis. SOF 28. She acknowledges that on the day Crisafulli told her she needed to be wearing a face covering he also told at least one other employee that she also needed to put on a face covering. SOF 25. Beloate believes that Crisafulli told her and the other employee to wear the face coverings because he was "bullying" them but could not say why she believed he chose to bully her and the other employee specifically. SOF 26. It seemed kind of random to her. SOF 27. Even if Crisafulli did not correct every single employee on their use of a face covering Beloate acknowledges that at worst the enforcement of the policy was random and was not targeted based on any protected classification.

While the light duty restriction limited some of Beloate's job responsibilities it allowed her to return to work under essentially the same conditions she had been working before but did not require her to be in locations where she would have to wear a face covering.[7] Beloate explained during her deposition that she was dissatisfied with the light duty accommodation because she perceives light duty as "a term that they give to people who can't carry their full route. And if you can't carry your full route, you're treated very badly." SOF 80. Beloate's interpretation of the light duty accommodation she received is that it was USPS's "hoop to jump through so they could legally bully" her. SOF 81. Beloate could not say whether she believed the specific work assignment she was given (that is, not going into the post office to case her mail but picking her mail up on the dock and delivering it) would have been acceptable to her if it had not been called "light duty." SOF 82. As discussed below, Beloate has not identified any discrimination, harassment, or adverse actions taken against her by USPS upon her return to work in May.

USPS anticipates that Beloate may attempt to argue that she was constructively discharged when she resigned on June 8. As an initial matter, no constructive discharge claim was raised in the relevant EEO complaint (in fact, the EEO complaint was filed weeks before Beloate tendered her resignation) and therefore any constructive discharge argument was not properly exhausted. *See Parisi v. Boeing Co*., 400 F.3d 583, 585 (8th Cir. 2005). (a claimant must give notice of all claims in her administrative complaint); *Henson v. Union Pacific Railroad Co*., 3 F.4th 1075,

---

[7] Beloate essentially argues that any action taken by USPS short of allowing her to work her same job with no modifications while not wearing any sort of face covering in violation of USPS policy was discriminatory. This argument runs contrary to common sense and the purpose of the Rehabilitation Act. It cannot be true that the accommodation of an employee's disability where possible via job modification is both a legal requirement and impermissible discrimination. *See Peebles*, 354 F.3d at 767 ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations.").

1081-82 (8th Cir. 2021) ("We conclude that [plaintiff's] constructive discharge claim is not reasonably related to his charge allegations. [Plaintiff] did not assert in his charge that he had been or was about to be constructively discharged."). However, even if this claim had been properly exhausted it would fail.

"To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010). "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). "To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Id.* An employee must show more than just a Title VII violation to prove that a constructive discharge has happened. *Hoard v. Burns Bros., Inc.*, 14 F.3d 835, 841-42 (8th Cir. 1998).

Beloate testified that she decided to resign on June 8 because she "feared going back and being harassed like [she] had seen with other people." SOF 87. Beloate testified during her deposition that all of the postal carriers in St. Joseph were subjected to harassing and rude supervisors who just wanted to move up the supervisory ladder within USPS. SOF 88. She stated that she "knew if [she] went back, [she] was going to be harassed." SOF 89. The only purported harassing or bullying conduct she could identify as occurring on May 10 or May 11 (the only two days she came back under the light duty restriction) were that she was "yelled at" by Crisafulli when she stopped to talk to one of her friends in the parking lot[8] and he followed her on her route

---

[8] Notably, one of Beloate's instructions related to her light duty accommodation was that "[w]hen delivering, at work, and/or on USPS time, it is imperative that you maintain social distancing from all customers and every other person you encounter. You must take this seriously and courteously prevent people from approaching you." SOF 67. Talking to one of her friends in the USPS parking lot without maintaining social distancing was a violation of that instruction.

for a short period of time on May 11 to deliver a letter to her related to the work hours accommodation she had requested.[9] SOFs 73-77.

Neither of these actions is sufficient to rise to the level of an objectively intolerable working environment. Her testimony that she resigned in fear of being harassed and being treated poorly reflects that the high bar for constrictive discharge was not satisfied here—she did not quit due to actual intolerable behavior on the part of her supervisors, but "assumed the worst," "jumped to conclusions," and unilaterally quit. *Tidwell*, 93 F.3d at 494.

No evidence suggests that Beloate was subjected to any disparate treatment or intentional discrimination as a result of her PTSD diagnosis. Rather, USPS appropriately acted to accommodate Beloate's claimed disabilities while enforcing its COVID-19 policies and ensuring the safety and welfare of its other staff members.

### B. No Evidence Supports Beloate's Retaliation Claim

In Count II Beloate alleges that USPS retaliated against her when she requested an accommodation and raised her disability with respect to the face covering requirement. A claim of retaliation pursuant to Title VII is not based upon discrimination, but instead upon "an employer's action to punish an employee who makes a claim of discrimination." *Haas v. Kelly Servs., Inc*., 409 F.3d 1030, 1037 (8th Cir. 2005). A plaintiff "first must demonstrate a prima facie case of retaliation to survive summary judgment." *See Jackson v. United Parcel Service, Inc*., 643 F.3d 1081, 1088 (8th Cir. 2011). To meet this burden, the plaintiff must show that (1) she engaged in a protected activity; (2) defendant subsequently took an "adverse employment action" against her;

---

[9] Beloate testified that her supervisor "followed" her on her route for ten or fifteen minutes, handed her the letter, and left. SOF 76. She also acknowledges that USPS mail carriers will periodically undergo monitoring of their mail delivery as part of their evaluations. SOF 77.

39

and (3) there was a causal connection between the protected activity and the adverse employment action. *Id*.

Beloate's only identified protected activity was when she demanded not to be required to wear a face shield on February 13, 2021 and then filed her EEO complaint related to this conduct. For the same reasons discussed above in conjunction with her disability discrimination claim, there is absolutely no evidence to suggest that USPS's actions putting Beloate on leave when she refused to wear the face shield (the only potentially adverse action identified) constituted retaliation. The objective evidence reflects that USPS took this action because Beloate refused to comply with the face covering requirement as modified by her accommodation not to wear a mask. Putting her on leave constituted an acceptable temporary accommodation in light of the USPS's COVID-19 policies. Ultimately Beloate was permitted to return to work under a different accommodation (that is, "light duty") but after working two days she stopped coming to work. And, as further discussed above, any constructive discharge claim (1) was not properly exhausted and (2) fails to satisfy the standard for constructive discharge. USPS is entitled to summary judgment on Beloate's retaliation claim.

### C. Any Claim for Harassment or Hostile Work Environment Would Fail

Beloate did not specifically raise any claim related to a hostile work environment or harassment in either her Complaint, Doc. 1, or EEO Complaint. Beloate is prohibited from raising a claim for hostile work environment or harassment in this proceeding as she has not exhausted it.[10] However, at various points in the Complaint Beloate references "harassment" and in an abundance of caution USPS addresses any such claim here. For the following reasons, any claim

---

[10] *See* discussion *supra* at pages 37-38, discussing failure to exhaust with respect to any constructive discharge claim.

by Beloate for hostile work environment or harassment would fail on the merits even if it had been exhausted.

A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" as viewed objectively by a reasonable person." *Tademe v. St. Cloud State University*, 328 F.3d 982, 991 (8th Cir. 2003). To make a valid claim for hostile work environment in the Eighth Circuit, the plaintiff must be able to establish as a matter of law that: (1) She was a member of a protected group; (2) She was subjected to unwelcome and discriminatory harassment; (3) That harassment was because of her membership in the protected group; (4) The harassment was severe enough to affect a term, condition, or privilege of his employment by creating a hostile work environment. *Stone v. McGraw Hill Financial, Inc*., 856 F.3d 1168, 1175 (8th Cir. 2017).

The test for severity "includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." *Duncan v. General Motors Corp*., 300 F.3d 928, 934 (8th Cir. 2002). To determine whether the environment is objectively offensive, the court must "examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Clay v. Credit Bureau Enterprises, Inc*., 754 F.3d 535, 540 (8th Cir. 2014). Relatively minor inconveniences or irritations are not actionable. *Harris v. Home Sav. Ass'n*, 730 F. Supp. 298, 307 (W.D. Mo. 1989) (citing *Minteer v. Auger*, 844 F.2d 569, 570-71 (8th Cir. 1988); *Tolliver v. Yeargan*, 728 F.2d 1076, 1077-78 (8th Cir. 1984)).

The only purported "harassment" or "bullying" identified by Beloate relates to efforts by her supervisors to get her to comply with face covering requirements and the terms of her "light duty" accommodation. She claims that Crisafulli yelled at her because she was not wearing a face covering and was talking to her coworker in the parking lot at work. She further claims that she was harassed when Crisafulli delivered her a letter related to an accommodation request while she was out delivering mail and claims that at a few points USPS employees saw her working a different job for the City of St. Joseph and watched and/or took photos of her doing so. SOFs 73, 80-82, 87-90.

None of these actions arise to the level of harassment or creating a hostile work environment. The conduct complained of was at most rude and unpleasant—Beloate does not identify any ongoing "extreme" treatment that poisoned her working environment. *Stubbs v. Ford Motor Co.*, 2008 WL 926404, at *8 (W.D. Mo. March 31, 2008); *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098, 1101-02 (8th Cir. 2005); *O'Brien v. Dept. of Agriculture*, 532 F.3d 805, 809-810 (8th Cir. 2008) (collecting cases reflecting this principle). "Title VII does not prohibit all verbal or physical harassment and is not a general civility code for the American workplace." *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 846 (8th Cir. 2006) (internal quotation marks omitted). Thus, even if properly exhausted, any claim by Beloate for harassment or hostile work environment would fail on the merits.

## V.   Conclusion

A jury could not find in favor of Plaintiff Paige Beloate on any of his claims. This case should not proceed to trial. Defendant requests that the Court grant summary judgment for Defendant.

42

Respectfully submitted,

Teresa A. Moore
United States Attorney


By     ***/s/ Elizabeth D. Hatting***
       Elizabeth D. Hatting, Missouri Bar No. 67337
       Assistant United States Attorney
       Charles Evans Whittaker Courthouse
       400 East Ninth Street, Fifth Floor
       Kansas City, MO 64106
       PHONE: (816) 426-3130
       FAX: (816) 426-3165
       E-MAIL: elizabeth.hatting@usdoj.gov
       ATTORNEY FOR DEFENDANT

43